**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **5:07-CR-16 (WDO)** |
| **LEONARD EARNEST ROYSTER,** | : | |
| | : | |
| **Defendant.** | : | |

# ORDER

Before the Court are Defendant's Motion to Suppress [Doc. 270] and Motion for Disclosure [Doc. 271]. The Government has complied with Defendant's Motion for Disclosure, so that Motion is dismissed as moot. For the reasons set out below, Defendant's Motion to Suppress is hereby granted in part and denied in part.

## I. INTRODUCTION

Defendant Royster was charged along with fourteen other co-defendants and alleged co-conspirators in a five-count indictment. Count One charges Defendant Royster with conspiracy to possess with the intent to distribute more than five kilograms of cocaine between January 1, 2005 and December 30, 2006. The evidence the Government intends to present against Defendant Royster was obtained through wiretaps on phones used or subscribed to by Defendants Royster and Anthony Walker from September 21, 2006 until December 14, 2006.

Defendant has filed a motion to suppress physical evidence, statements,

1

identification, and testimony that law enforcement seized as the result of an allegedly illegal wiretap of Defendant's telephone communications and search of Defendant's person, property, and residence.  See Doc. 270.[1]

## II. FACTUAL BACKGROUND

This case involves a home search and wiretaps placed on four different numbers, all to which Defendant objects. The facts of this case are extensive and detailed.  Because there were four orders for interception of communications, many  facts are relevant to multiple orders or extensions of orders.  The Court has therefore attempted to highlight below the most relevant facts for each warrant.[2]

### A.  The First Warrant for Walker's Phones: 229-404-7806 and 229-347-1553

On or about September 21, 2006 Special Agent Dell Cole of the Georgia Bureau of Investigation ("GBI") submitted an affidavit and application for a wiretap on two phones used by Anthony Walker, an individual also charged in this case, based on Cole's investigation of a cocaine distribution ring in the Tifton, Georgia area.  After detailing his

---

[1]Defendant objects to the Government's use of any statements he made during or after the search of his residence based on alleged Miranda violations, and he requests a Jackson v. Denno hearing to determine if the statements were voluntary.  The Government, however, has no plans to introduce any statement Defendant may have made.  This issue is therefore moot.

[2]The affidavits in support of the applications for warrants in many instances describe conversations that were spoken in "code."   This is consistent with the typical practice of drug traffickers and distributors.  See Gov't's Ex. 1, tab A at 3.  The Court has reviewed both the content of the conversations and the Agent's interpretations of those conversations and finds that the interpretations are reasonable.  In the interest of brevity, the Court often describes only the interpretations.

training and experience the affidavit explained in detail the investigation that had been conducted.

The affidavit contains information that was provided by several informants, including CI-80-672.[3]  This informant was initially debriefed by agents on April 1, 2006, roughly five and a half months before the agent submitted the affidavit.  During the debriefing, the informant disclosed that he had recently been in contact with Lorenzo Jackson.  As a result of the informant's contact with Jackson, the GBI learned that Jackson was a close associate of Walker who had information about Walker's drug dealings.  The informant relayed that not long before his conversation with Jackson, Walker had obtained 120 kilograms of cocaine for distribution.  Jackson further advised the informant that Walker routinely sold 50-70 kilograms of cocaine at a time in the Tift County area.

Agent Cole then reached out to Investigator Joe Chestnut on April 24, 2006.  Through this conversation, Cole learned that on March 6, 2006 Chestnut had arrested a local drug dealer in Tifton named Reginald Ford.  Ford had attempted to buy cocaine from a cooperating source.  During a post-Miranda interview, Ford reiterated what CI 80-672 had advised Agent Cole, i.e., that Anthony Walker was one of the largest cocaine dealers in the area.

In order to take advantage of Lorenzo Jackson's current involvement with Walker, law

---

[3]The Government has since identified this informant as Christopher Hall.  Hall pled guilty to the charges filed against him in another case and was sentenced by this Court on September 26, 2007.  See Doc. 289.

enforcement used CI 80-672 to attempt a meeting with Jackson, Walker, and the informant. A meeting was set for the three men for May 4, 2006. The plan was for the informant and Jackson to meet Walker at the Long Horn restaurant in Tifton. Once Jackson and the informant arrived, Jackson was to call Walker who would deliver nine ounces of powder cocaine to the informant for approximately $5,400.

Jackson and the informant traveled to the restaurant. Although Jackson called Walker several times, Walker did not deliver the cocaine. Instead, Walker directed the informant and Jackson to go to the Classy 89 Hair Salon in Tifton. While at that location, Jason White met the informant and Jackson, entered the informant's car, and sold the informant the cocaine.[4]

While the drug sale involving Jackson, the informant, and White took place, law enforcement officers conducted a limited surveillance of the area. During this surveillance, they observed a truck in the area similar to the truck driven by Walker. Jackson later confirmed Walker's presence when he told the informant that Walker had been parked near the location where the May 4, 2006 deal took place. In addition, GBI's analysis of call records confirmed that during the time Jackson and the informant were arranging the drug deal involving Jason White, someone calling from 229-402-7806 (Walkers's number) was in contact with Jackson. They also showed that someone calling from 229-881-5556 (Walkers's number) was calling White. Although this type of information would be highly probative that Walker was in the drug trade and was using his phone to distribute cocaine,

---

[4]White has also been charged in this case.

4

the investigating officers decided to develop another informant.

On May 9, 2006, CI 80-672 called officers to tell them that he obtained two phone numbers from Jackson's phone that Walker was using: 229-402-7806 (which confirmed a phone number that the informant had initially provided) and 229-881-5556. An Alltel Wireless representative later revealed that the 229-881-5556 number was subsequently changed. During the investigation Alltel responded to a subpoena and revealed that the new number was 229-347-1553.

In addition, officers developed information about Walker from another source, Buford Jenkins. Through law enforcement's work with Jenkins they were also able to confirm CI 80-672's reliability. CI 80-672 called Agent Cole on July 10, 2006 and told him that Jackson had related to the informant details about Jackson's and Walker's dealings with Burford Jenkins. Jackson stated that he, Walker, and Jenkins had met on July 6, 8, and 10, 2006. During this time, Jenkins negotiated the purchase of four kilograms of cocaine for $80,000. Jackson also told the informant that $7,500 of the total amount was in counterfeit money, which led to multiple calls to Jenkins to remedy the situation. Jenkins, who was cooperating with police in connection with is earlier arrest, confirmed much of this story when he spoke with Agent Cole on July 10, 2006.

According to Jenkins, his first meeting with Walker and Jackson took place on July 6, 2006 in Tifton. Significantly, Jenkins reached Walker using Jackson as a middle man, and Jackson was the same individual who orchestrated the cocaine sale on May 4, 2006 between CI 80-672, Jason White, and Anthony Walker. At the second meeting on July 8th, Jenkins,

Jackson, and Walker met in Omega, Georgia. Walker agreed to sell Jenkins as many kilograms of cocaine as he wanted for $20,000 each, but Jenkins maintained that he wanted to negotiate price at a later date. Jenkins told law enforcement that a third meeting between Jenkins, Jackson, and Walker took place on July 10, 2006 during which Walker again agreed to sell Jenkins multi-kilogram amounts of cocaine for $20,000 per kilogram.

In order to confirm that these meetings had in fact taken place, the officers conducted a toll analysis to see if Jackson's telephone number of 229-821-0555 had contacted Walker's phone number of 229-402-7806. This analysis showed phone calls between these men on the dates and during the times Jenkins and the confidential informant claimed the meetings took place. The call patterns were also consistent with CI 80-672's story that after the July 10th meeting Walker discovered he was paid partially in counterfeit money and a flurry of phone calls were exchanged as the men sorted out the problem.

Agent Cole again spoke with Jenkins on July 25, 2006. Jenkins told Cole that he had spoken with Jackson and that Jackson was ready to sell him multiple kilograms of cocaine. He stated that Jenkins, Jackson, and Walker had met on two previous occasions and he had witnessed Jackson and Walker talk on their cell phones about drug transactions.

On August 9, 2006, Jenkins and Cole placed a three-way, recorded phone call to Jackson to arrange a cocaine buy from Walker, using Jackson as a middle man. Jenkins and Jackson discussed a price of $19,500 for each of five kilograms of cocaine. Jenkins requested that Jackson ask Walker if the price could be reduced, and Jackson agreed to do so and call Jenkins back. On the same day, another call was recorded during which Jackson

6

advised Jenkins the price would not change and Walker had the five kilograms of cocaine. Jackson stated, "he got so much stuff . . . and it's also good man." During this conversation Jackson said that Walker would not meet with Jenkins in person in case Jenkins was working with police. He would use a middle man instead.

On September 14, 2006, law enforcement developed a fourth informant named Frederick Ferguson. He had been arrested in Tifton on that date in connection with the purchase of one kilogram of cocaine. In a post-<u>Miranda</u> interview, independent of information provided by the other informants, Ferguson stated that Walker was distributing fifty kilograms of cocaine each month in Tifton, Georgia. Ferguson identified Michael Kinsey as Walker's "right hand man." He also identified Devictor Wilson and Tony Hill as members of the Walker organization.

Agent Cole then conducted a toll analysis for 229-402-7806 for June 12, 2006 through July 12, 2006. This analysis showed a total of over 2,000 calls made to or from the target phone. An analysis for 229-881-5556 for June 12, 2006 through July 7, 2006 revealed 1,867 calls to or from known drug traffickers. An analysis for 229-347-1553 (the replacement number for 229-881-1556) for July 28, 2006 through August 28, 2006, showed 680 calls. From August 29, 2006 through September 17, 2006, 631 calls were made to and from 229-347-1553 and 1,623 calls were made to and from 229-402-7806. The toll analyses for each number reflected that many of the calls were repeat calls to subjects identified as known or suspected individuals involved in the importation, transportation, and distribution of controlled substances.

Agent Cole submitted a wiretap affidavit based on the foregoing information. The affidavit set forth that Walker and others were operating a continuing criminal enterprise, which had operated over a long period of time before and up to the time the application was filed. The affidavit contained current information from the four informants, all of whom appeared to the agents to be involved in the distribution of cocaine in Tifton and who provided detailed information regarding Walker's activities. The interception order for these numbers was granted on September 21, 2006 and terminated on October 21, 2006.

On October 20th, Agent Cole submitted an affidavit and application for an extension of the interception on 229-402-7806 and 229-347-1553. In support of the extension, the affidavit related details of conversations between Walker and ten individuals obtaining cocaine from him and five different individuals obtaining ecstasy or marijuana from him. It also described in detail approximately nineteen conversations regarding drug dealing or concerns about police investigations. Many of these conversations were with or about Defendant Royster. The extension was granted.

Agent Cole submitted the application for a second extension on November 21, 2006. This application was based on eight drug-related conversations, mostly regarding Walker's California drug supplier, and the arrest of a runner who was suspected of transporting drug money for the Walker organization. The affidavit details five calls made on the 229-402-7806 number. On November 15, 2006 Walker and Saul Falcon discussed Walker potentially purchasing cocaine from Falcon. Walker also spoke with Kinsey, another drug dealer, three times on November 15, 2006 and November 16, 2006. They spoke about efforts to buy

marijuana and cocaine, the possibility of splitting a shipment of cocaine, and experiences the men had in the past when buying drugs from Falcon. In addition, on November 18, 2006 Walker used the 229-402-7806 phone number to speak with an unidentified Hispanic man about a drug deal.

Several important calls were also intercepted on the 229-347-1553 number. On November 18, 2006 Walker called an unknown male who wanted to buy drugs. On November 17, 2006, a conversation was intercepted between Walker and an unidentified male discussing a payment Walker owed for cocaine that had previously been "fronted" to him. During the conversation, Walker stated he had gotten $5,000 for "Unc" and needed to get $14,000 more to make the complete payment. Agent Cole had previously determined that "Unc" was a nickname for Walker's uncle, Defendant Leonard Royster. He concluded that Walker was referring to a payment that Royster was to make for the fronted cocaine. On the same day, Defendant Royster spoke with Walker on the 229-347-1553 number and told him they were "getting ready to pick that up." Agent Cole believed this to refer to the shipment of drugs from California.

After this conversation, surveillance was immediately set up at Royster's residence. As a result of this surveillance, Royster was observed meeting with a truck driver at the Pilot truck stop in Tifton. When the officers later stopped the truck after keeping it under continued surveillance they found $828,970. The driver admitted that he had obtained the money from an African American male and had been instructed to take it to California. The extension was granted based on this information.

## B. Warrant for Royster's Phone Number: 229-392-6181

On October 16, 2006, Agent Cole submitted an application and affidavit to intercept calls on 229-392-6181, which the court granted. The phone records showed that the phone was listed to Leonard Royster of L&R Trucking at 3122 6th Avenue, Tifton, Georgia. The affidavit recited many of the same facts as the affidavits used to obtain a wiretap on Walker's phones. In addition, it detailed eleven calls between Walker and Royster between November 26, 2006 and October 11, 2006.

Among those calls was a September 26th call intercepted from Walker's phone to this number, during which Walker told Royster that "he just brought me the bread and [I'm] fixing to go count it now." On October 3, 2006, Royster called Walker on the target phone and Walker told Royster he was looking for "five dots," i.e., five kilograms of cocaine. On that same day, Royster called Walker again and Walker told Royster he may need him because "old boy's people" just called. The following day, Royster called from the target phone and said he had "two dudes who wanted one a piece and I ain't got nothing solid. All I got is broke." Several days later, the agents intercepted a call from Walker to Royster on the target phone during which Walker asked Royster "how many are left" and Royster responded "about 2-o," which Agent Cole interpreted to mean 20 kilograms of cocaine.

The application and affidavit also contained details of conversations in which Walker voiced concern about a surveillance helicopter that had flown over Walker's house and was making him nervous. Before that conversation ended, Royster asked Walker if he was going to get rid of the "78" number. Agent Cole believed this was in reference to 229-402-7806.

Walker responded that he had intended to but had not gotten around to it. The other calls listed in the affidavit provided further evidence of drug trafficking activity.

On November 14, 2006, Agent Cole submitted an affidavit and application for an extension on this phone, based on the previous application and the numerous calls between Royster, Walker, and other parties between November 4, 2006 and November 11, 2006. Among those calls was a November 4th call with an unknown female who asked Royster if she "could get four of them." Later that day, Royster told a female he "had those parts she had ordered." During a conversation between Royster and Walker on November 6, 2006, Walker told Royster that he had a person who wanted "six" even though he had only wanted "five" previously. He asked Royster if he had wrapped any of the paper yet, to which Royster responded he had not. Walker stated he had seventy more and was trying to make it easier on Royster. Agent Cole interpreted this to mean packaging of drug money for shipment to California. On November 11th, Royster called a female and she told Royster she had been trying to reach him because she "needed three of them today."

### C.  Warrant for Walker's Third Phone Number: 229-392-9234

While monitoring calls from Walker's phone number 229-402-7806, the agents learned that Walker had dropped that number and started using 229-392-9234. All-tel's records show that this later-acquired phone number had been obtained on that date in the name of "M M" with a residential address that the officers had previously confirmed as Walker's address. Agents also monitored phone conversations between Walker and an individual who identified herself as Shameka referencing the new phones she had purchased

for Walker.

The affidavit for the wiretap also stated that several calls from Walker's new phone number had been intercepted from the tap on Royster's phone (229-392-6181). In those calls, the men discussed ordering a new shipment from their supplier in California, "Cuz." They also coordinated a meeting between the two of them for a delivery of cocaine. On October 23, 2006, Walker called from the new number (229-392-9234) and told Royster that the number from which he was calling was his new number and "I'm getting rid of my 402 number." Resp. Mot. Suppress, Ex. 1-P at p. 11. Royster said he would program the new number into his phone. The court granted the tap on this number on October 24, 2006.

An extension on this number was granted on November 29, 2006. The affidavit for the extension cites a call on the 229-392-9234 number in which Walker asked Royster if everything had "gone through" and Royster responded that he was "getting ready to drop the change." Agent Cole interpreted this to refer to attempts by Walker and Royster to transport drugs proceeds from Tifton to California via the tractor trailer. It recites the facts involving the November 17, 2006 surveillance of Royster and later arrest of the truck driver with large amounts of currency. The extension is also based on a number of phone calls discussing the sale of large amounts of cocaine and marijuana between Walker and Kinsey and Walker and an unidentified male.

### D.  Warrant for Royster's Residence

On December 12, 2006, Mike O'Hara of the Tift County Drug Task Force provided an affidavit in support of an application for a search warrant for Royster's residence, 3101

3rd Avenue, Tifton, Georgia. The objects of the search were specified as cocaine, U.S. currency, and all packaging, receipts, ledgers, documents, containers, and proceeds derived from and used in the distribution of cocaine. The affidavit stated that Agent O'Hara had been working with Source 1 for two and a half months, and Source 1 had provided information that was proven to be reliable and truthful. It also stated that the information Source 1 had given relating to Royster's drug activity had been "verified by agents of the Mid-South Narcotics Task Force, the Georgia Bureau of Investigation and the Drug Enforcement Administration." Aff. & Application Search Warrant at 1. In addition, it provided specific facts about a verified tip that Source 1 provided:

> On one occasion Source 1 revealed that Walker contacted Royster and ordered a large quantity of cocaine and Royster met with and delivered the cocaine to Walker on a rural country road. This was verified through surveillance and the use of a court ordered vehicle tracking device that had been placed on one of Walker's vehicles.

Id.

On November 17, 2006, a separate occasion, Source 1 alerted law enforcement to Royster's plans to meet with an individual to deliver a large sum of money for a shipment of cocaine. Police surveillance observed Royster bring something with him to his vehicle. He then drove to a Pilot Truck Stop and met with an individual for several minutes before returning to his car. The individual was kept under constant surveillance until law enforcement pulled him over and searched his vehicle. They found fifty-one bundles of U.S. currency totaling $870,970. It further stated that "each bundle was wrapped in plastic wrap

and dryer sheets which is consistent with methods used by individual trying to conceal currency or drugs from law enforcement. After offering all of the above information as proof of the reliability of information provided by Source 1, the affidavit went on to state that within forty-eight hours prior to Agent O'Hara's request for a search warrant, Source 1 revealed that Royster had inquired about a shipment of cocaine.


## III.  ANALYSIS

Defendant Royster has filed a motion to suppress the evidence seized as a result of these wiretaps and makes the following arguments:

1.  The affidavits in support of the applications and orders for wire intercepts did not allege sufficient probable cause;
2.  The orders failed to detail or specify the persons to be intercepted;
3.  "Upon information and belief," the agents failed to minimize the intercepted conversations;
4.  The applications and orders failed to particularly describe the person to be intercepted;
5.  The applications and affidavits did not allege a sufficient showing of necessity; and
6.  The tapes were not sealed within the requisite statutory time period.

Because the searches at issue were conducted by order of a court, the burden of proof for the Motion to Suppress is on Defendant. See Rogers v. United States, 330 F.2d 535, 542 (5th Cir. 1964). But see United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983) (distinguishing the burden of proof in warrantless searches and seizures).

### A.  Reliability of Informants Used

As a preliminary matter, the Court addresses Defendant's contention that the

Government failed to prove the information from the informants was reliable and thus failed to prove the information was sufficient to support the first warrant request. "An informant's credibility is determined based upon the totality of the circumstances, including the traditional review of the basis of his knowledge and reliability." United States v. Green, 40 F.3d 1167, 1172 (11th Cir. 1994) (citing Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)).

In the instant case, the information was obtained primarily from dealings with CI 80-672, an informant who had previously given information that was corroborated by other informants and agents conducting the investigation in this case, and also by phone records. Jenkins and Ferguson confirmed CI 80-672's claim that Walker was a large-scale drug dealer in Tifton. Jenkins confirmed that Jackson was Walker's middle man, which was then confirmed by Jackson on a recorded phone call. CI 80-672 provided accurate information regarding Jenkins's meetings with Jackson and Walker. His claims that drug deals were occurring were consistently corroborated, and his assertion that Walker orchestrated the sales was confirmed by physical surveillance and phone records. CI 80-672 was therefore credible.

**B. Probable Cause for Interception of Communications**

A government agent requesting a wiretap must first establish probable cause that a particular offense has been, is being, or is about to be committed. United States v. Van Horn, 789 F.2d 1492, 1498 (11th Cir. 1986) (citing 18 U.S.C. § 2518(1)(b)(I)). A court has the discretion to permit a wiretap for thirty days where the information in the affidavit sets

forth a continuing criminal enterprise, operating over a long period of time. Id. When a

defendant claims that the extension of surveillance was without probable cause, courts focus

on whether the elements of the alleged crime were shown. Facts relied on for the initial

surveillance order may be relied on for an extension of the order, and the court of appeals

has noted that probable cause may be "boosted by the interception of" later, pertinent

conversations tending to confirm the existence of the conspiracy or other crimes charged.

Id. at 1502. "As with other types of search warrants, the probable cause needed to obtain a

wiretap must exist at the time surveillance is authorized." United States v. Domme, 753 F.2d

950, 953 (11th Cir. 1985) (citations omitted).

    1.  Walker's Phone Numbers: 229-402-7806 and  229-347-1553

Agent Cole's September 21, 2006 application for the first two wiretaps on Walker's

phones was supported by more than sufficient probable cause that the offense of drug

distribution, on a large scale, had been and was continuing to be committed. The information

provided was obtained from well known and trusted sources, recorded phone conversation,

a controlled purchase of cocaine, and toll analysis. CI 80-672 told law enforcement that one

of Walker's associates reported that Walker had recently obtained 120 kilograms of cocaine

for distribution. Reginald Ford and Frederick Ferguson independently confirmed that Walker

was one of the largest cocaine dealers in the area. During the May 4, 2006 controlled buy,

phone records, physical surveillance, and statements by Walker's co-conspirators provided

strong evidence that Walker, although not directly present at the drug deal, was orchestrating

it from behind the scenes. Jackson confirmed that Walker worked through middle men in

a recorded conversation. CI 80-672 provided phone numbers for Walker: the 229-402-7806 number and 229-881-556 number, which was later changed to 229-347-1553. In addition, Walker agreed to sell multiple kilograms of cocaine to Buford Jenkins during their July 8, 2006 and July 10, 2006 meetings. The occurrence of these meetings was confirmed with phone records. Jenkins later placed a recorded phone call to Jackson, Walker's middleman, during which Jackson told Jenkins that Walker was ready to sell him multiple kilograms of cocaine. Finally, Walker's phone records showed that he was making repeated phone calls to individuals known or suspected to be in drug trafficking. These facts constitute probable cause for the order granting the intercepts of 229-402-7806 and 229-347-1553 on September 21, 2006.

The court granted an extension for these numbers on October 20, 2006. The interception of Walker's phone numbers had produced evidence of approximately fifteen individuals who were buying cocaine, marijuana, or ecstacy from Walker, and helped to identify some of them. Conversations were recorded, many with Defendant Royster, regarding payment for drugs and Walker's concern about being detected by law enforcement. The affidavit also incorporated the contents of the prior applications. This evidence was sufficient to support a finding of probable cause; therefore the extension was properly granted.

The application for a second extension was submitted by Agent Cole and the district attorney on November 21, 2006. While the second application for an extension relied on some of the information used in the previous applications, it also contained updated

information in the form of the conversations between Walker, Kinsey (who Ferguson identified as Walker's "right hand man"), and others. The affidavit reported multiple conversations about Walker's California drug supplier, the arrest of a drug runner who was transporting drug money that Walker paid, and efforts to orchestrate a number of drug deals. These later conversations provided substantial evidence to establish probable cause that drug distribution on a large scale was continuing by these individuals.

### 2. Royster's Phone Number: 229-392-6181

As explained above, supra II.B., during the intercept on Walker's phone law enforcement captured Royster discussing drug distribution on multiple occasions. The men talked about Walker obtaining multiple kilograms of cocaine from Royster to sell to others on several different occasions and about avoiding detection because they suspected police were investigating Walker's activities. Taking all of the evidence into consideration, there was sufficient evidence to establish probable cause for the interception order on Royster's phone.

On November 14, 2006, the Court granted an extension of the Order intercepting Royster's phone. Agent Cole submitted an affidavit and application for an extension on this phone, based on the previous application and the numerous calls between Royster, Walker, and other parties recorded during the initial interception period. In four of the calls Royster spoke with an unidentified female and arranged to sell her several ounces of cocaine on two different occasions. Two conversations with Walker centered around their largest cocaine dealer, who was located in California, and his efforts to get a new shipment to the men.

They also discussed the need to prepare payment for previously fronted cocaine. Based on a totality of the circumstances, these calls provided probable cause for the extension on Royster's phone.

### 3. Walker's Phone Number: 229-392-9234

While monitoring calls from Walker's phone number 229-402-7806, the agents learned that Walker had dropped that number and started using 229-392-9234. In calls to Royster captured during interception of Royster's phone, Walker used this new number to discuss distribution of drugs and stated that he would drop the old number for the new one. Based on the totality of the circumstances in this case, including evidence that Walker had already begun to use this new number to orchestrate drug deals and the massive ongoing investigation, there was probable cause that the new number would be used by Walker to continue the distribution of drugs.

Judge McCorvey ordered an extension of the intercept on November 29, 2007. There was probable cause for this order because conversations between Royster and Walker indicated that they were working together to make a payment for a large amount of cocaine transported from a supplier in California. Agent Cole's interpretations of Royster's and Walker's conversations were confirmed when agents observed Royster behaving suspiciously and then meeting a truck driver in Tifton on November 17, 2007. When police stopped the truck driver they discovered he was carrying $828,970 and the driver confessed he had received it from an African American man and had been directed to deliver it to California. These facts were sufficient to create probable cause that Royster and Walker were engaged

in an ongoing criminal narcotics distribution operation.

###### 4. Good Faith Exception

Defendant contends that if the Court finds the interception orders are invalid then the "good faith" exception does not apply because–according to Defendant–this exception does not apply to electronic surveillance cases. However, the Eleventh Circuit has recognized and applied the good faith exception in this type of case. See United States v. Malekzadeh, 855 F.2d 1492, 1497 (11th Cir. 1988) (involving a wiretap and charges of conspiracy to distribute cocaine and heroin). "The Supreme Court has recognized a good faith exception to the exclusionary rule that asks whether the offending officers acted in the objectively reasonable belief that their conduct did not violate the [F]ourth [A]mendment." Id. (citing United States v. Leon, 468 U.S. 897 (1984)).

> The exclusionary rule works as a deterrent to willful conduct that violates individual rights. The Court recognized that, in some circumstances, application of the rule affords none of these protections and stated that "if the purpose of the exclusionary rule is to deter unlawful police conduct then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."

Id. (citation omitted).

Defendant Royster pointed to no evidence that the law enforcement officers in this case had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment, and therefore the good faith exception would

apply even if the Court had not found the surveillance otherwise valid.[5]

**C. Necessity**

When an application for a wiretap is involved there are several other factors to consider. "An application for interception must contain a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Van Horn, 789 F.2d at 1496 (citing 18 U.S.C. § 2518(1)(c)). The requirement that law enforcement show necessity prevents the routine use of electronic surveillance and limits its use to instances when less intrusive investigative methods would succeed. Id. "The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves." Id. (citation omitted).

In VanHorn, the court found that the following facts and circumstances established the necessity requirement: the agent's affidavit set forth numerous facts showing that ordinary surveillance techniques had been attempted and had failed; the affidavit explained that a search of the premises had been considered and rejected because it was not believed that there was sufficient physical evidence there to reveal the entire conspiracy or to successfully prosecute its members; the informants upon which the government was relying

---

[5]Defendant did point to a case from the Sixth Circuit Court of Appeals that held the good faith exception does not apply to warrants for intercepts issued under 18 U.S.C. § 2515. United States v. Rice, 478 F.3d 704, 711 (6th Cir. 2007). Malekzadeh serves as binding precedent directly on point, however, so this Court follows its holding.

feared for their lives because of threats from the defendant; government agents had tried and failed to gain introduction to the defendant and such attempts would endanger the lives of undercover agents and informants; and a grand jury investigation was rejected because the necessary witnesses were members of the conspiracy and would not voluntarily testify, and it had been impossible to determine the roles of various members of the conspiracy in order to judge who should be afforded immunity.  Id. at 1497-98.

### 1.  Interception of Walker's Phones

The first interception application and affidavit that Agent Cole submitted described several alternative investigative techniques that had been considered, tried, or failed: confidential sources, surveillance, pen register and toll analysis, controlled purchases of cocaine, and undercover police officers.  The affidavit explained that confidential informants were unable to provide comprehensive information about the members of the Walker organization and their roles.  Interviews of the suspects would only alert them of the investigation and were unlikely to produce any useful information.  Walker's house was located in a rural area on a street where many of the residents knew Walker, which made physical surveillance impossible to conduct without detection. Pen registers and toll records were used in the investigation, but these records were only useful to confirm that calls were made, not to directly prove any drug activity.  According to intelligence, Walker did not keep drugs at his home, so a search warrant for his residence would not be effective.  A search warrant for the location where law enforcement believed he stored drugs would not reveal the full scope of the operation.  The organization was extremely insular, so undercover

agents were "highly unlikely" to be able to gain access to Walker. A grand jury investigation was unlikely to be successful because cocaine traffickers generally fear testifying due to the possibility of retaliation. In addition, it would compromise the investigation by alerting the suspects of police activity.

Agent Cole reasonably concluded that these methods were unlikely to reveal the source of Walker's cocaine, the extent of the conspiracy, or the location of hidden assets. Agent Cole therefore established the necessity for the more drastic investigative tool of a wiretap for the initial order. The affidavits for the first and second extensions of this order, and the affidavits for 229-391-9234 and its extension incorporated the information from the original affidavit under the "Need for Investigative Warrant" heading. The fact that some or all of the information had been incorporated by reference is alone irrelevant. United States v. Dennis, 786 F.2d 1029, 1035 (11th Cir. 1986). (holding that "the information provided in the second application may satisfy the substantive requirement of section 2518(1)(c) without providing any additional explanation . . . of reasons why alternative investigative procedures are not likely to succeed there, since information that adequately informs the issuing judge of the limitations of alternatives to electronic surveillance in a given case may well apply" in a later application). The facts recited in the original affidavit applied with equal force at the time the subsequent extensions and orders were applied for and granted. Agent Cole therefore established the "necessity" for the both initial orders and the extensions for Walker.

### 2. Interception of Royster's Phone

In addition, the affidavit in support of the application for a wiretap on Royster's phone

establishes necessity for surveillance on that number. Confidential informants were of limited assistance because Royster and Walker dealt in large quantities of cocaine and therefore associated with only a limited number of individuals with whom they had long-term relationships. They were unable to provide current information on a day-to-day basis, and they could not identify the source of the narcotics, the means of distribution, or the identity of the distributor. Their information, even when considered as a whole, would not be sufficient to successfully identify and prosecute the members of the Walker organization. In addition, law enforcement had no informants who dealt directly with Royster. Royster conducted his business carefully in effort to avoid detection; intercepts of Walker's phone revealed that Royster provided Walker with advice on how to effectively evade law enforcement.

Interviews with associates, grand jury subpoenas, and undercover agents were determined to be unlikely to succeed for the same reasons as those identified in the affidavit for the warrant on Walker's phones. Likewise, pen registers and toll records were expected to yield evidence, but nonetheless could not serve as direct evidence of involvement in drug trafficking. According to law enforcement's intelligence, Royster did not keep narcotics at his home; a search of his home would therefore be fruitless. Officers hoped to use information gathered during the wiretap to discover where Royster was keeping the narcotics.

Physical surveillance of Royster had been unsuccessful, and a continued presence near his home was not attempted because the nature of Royster's neighborhood made it such that police surveillance would likely be detected and could compromise the investigation. In fact,

Royster's conversations with Walker demonstrated that Royster had already observed the limited surveillance that law enforcement attempted.

Defendant contends that interception of his phone was not necessary because the Government could monitor his phone calls with Walker through the taps on Walker's phones. Monitoring Walker's phones, however, provided an incomplete picture of the narcotics distribution operation. A separate order for Royster's phones was necessary to determine where the drugs originated, where they were stored, the extent of Royster's participation in the criminal activity, and who else was involved.

In the facts of this case the Government did demonstrate necessity for the original order. The affidavit in support of the application for the extension incorporate by reference the information from the original affidavit. The information and analysis that Agent Cole provided in the first affidavit were still relevant at the time the extension was sought and were therefore sufficient to demonstrate necessity.

### D. Minimization

Orders authorizing interception of communications must require that the order is executed in such a way to minimize interception of calls not otherwise subject to interception. VanHorn, 789 F.2d at 1501 (citing 18 U.S.C. § 2518(5)). The

> question is whether the agents' monitoring was reasonable in light of all the facts and circumstances of the case. . . . [Courts will place] little weight on the fact that the agents deviated somewhat from the conditions in the application. Although the practices employed by the agents are a consideration, we are more concerned with whether the agents in fact monitored nonpertinent conversations."

Id.  The burden is on the Government to demonstrate proof of minimization. United States v. Rizzo, 491 F.2d 215, 217 n.7 (2d Cir. 1974).

The hearing on the Motion to Suppress revealed the following facts:  On September 22, 2006, Agent Cole conducted a minimization briefing at the DEA office in Macon, Georgia.  During this briefing, Agent Cole read a minimization memorandum that covered all aspects of various types of calls that could be intercepted, which types should be listened to and marked as pertinent, and which calls should be minimized or rendered as privileged. Individuals who served as monitors on the wiretap were present at the briefing, and any monitors who were not present were required to read the minimization memorandum and sign a sheet detailing that they had read and understood the document.

The twelve-page memorandum provided detailed instructions on how to minimize and warned agents that failure to properly minimize could result in the suppression of all intercepted conversations.  It directed agents to determine whether the conversation was pertinent, innocent, irrelevant, or privileged; if the conversation was innocent, irrelevant, or privileged, the agent had to cease listening to, monitoring, or recording it.  The memorandum specified the conversations that could be intercepted, i.e., those relating or referring to the suspected illegal drug operation.  It advised agents that, before minimizing, they could listen to a conversation "only as long as it takes you to determine that the conversation is non-pertinent."  It also suggested that agents had more latitude to monitor conversations in an investigation of a narcotics trafficking conspiracy, and referenced the "two-minute rule" as a rule of thumb for the amount of time they could listen where the conversation was not

obviously non-pertinent.

Agents were allowed to spot check minimized conversations by periodically turning on the monitoring device to determine whether the conversation had become pertinent. As soon as the agent determined that the conversation remained non-pertinent the call had to be minimized again. If Walker's calls with an individual were "invariably innocent, non-crime related matters" then agents could not monitor conversations with those individuals at all. If the conversation was with an individual who invariably spoke to Walker about drugs, then the standards were relaxed. Privileged conversations between an attorney and his client, a clergy and penitent, doctor and patient, or husband and wife were not to be monitored. Agent Cole's testimony, the guidelines, and the documentation that agents read, understood, and agreed to follow those guidelines demonstrate that law enforcement made a reasonable effort to ensure minimization.

Agent Cole also conducted a review for each number intercepted during the investigation referencing the total number of calls intercepted compared with the percentage of calls minimized: for 229-402-7806, 14% of the calls were minimized; for 229-347-1553, 15% were minimized; for 229-392-6181, 46% were minimized; for 229-392-9234, 7% were minimized.

Defendant's main objection was to the lack of "minimization logs," which are sometimes kept in wiretap investigations and reflect which calls were minimized and by whom. Agent Cole's testimony revealed, however, that computerized minimization allowed agents to make notations on the computer regarding why they minimized certain calls, which

27

would make the minimization logs unnecessary.  In addition, the absence of minimization logs does not on its face demonstrate a failure to minimize.

The Government has met its burden in this case to demonstrate that it took reasonable measures to minimize interception of non-pertinent calls.  Furthermore, there is no specific evidence that the agents monitored non-pertinent conversations.  Rather, the practices employed were reasonable, as required by Van Horn, and did result in the identification and minimization of non-pertinent conversations.  In this case and in VanHorn, one of the goals of surveillance was to identify additional conspirators.  To meet this goal, the agents involved had to listen, albeit briefly, to thousands of conversations.  The agents made the necessary efforts to minimize interception of non-pertinent calls.  Accordingly, Defendant's "failure to minimize" argument has no merit.

### E.  Identification of Individuals Intercepted

Pursuant to 18 U.S.C. § 2518(4), "Each order authorizing or approving the interception of any wire, oral, or electronic communication under this chapter shall specify . . . the identity of the person, if known, whose communications are to be intercepted."  Id. A "wiretap application must name all individuals that the government has probable cause to believe are engaged in the criminal activity under investigation and whose conversations are expected to be intercepted over the target telephone."  United States v. de la Fuente, 548 F.2d 528, 538 (5th Cir. 1977) (citing United States v. Donovan, 429 U.S. 413 (1977)). However, failing to comply with this requirement does not mandate suppression of the evidence obtained from the wiretap when the defendant has shown no prejudice to him from

omission of his name or bad faith on the part of the Government in failing to name him.  Id.

On September 21, 2006, Judge McCorvey entered the interception order for 229-402-7806 and 229-347-1553.   On October 24, 2006, the Judge issued an order allowing interception of phone number 229-392-9234.  Both orders and the extensions of those orders allowed for the monitoring and interception of "communications by Anthony Sean Walker and other known and unknown persons."[6]   Royster should have been named in the orders after probable cause existed to believe that his conversations would be intercepted in the course of monitoring Walker's phones.  Royster has failed to present evidence to demonstrate bad faith or prejudice due to this omission, however.  Suppression of evidence from these intercepts would therefore be inappropriate.

**F. Staleness**

Probable cause to obtain a wiretap must exist at the time a court authorizes surveillance.   Domme, 753 F.2d at 953.   A warrant application must demonstrate that probable cause is continuing to occur, and a warrant application based upon stale information is therefore insufficient.  U.S. v. Bascaro, 742 F.2d 1335, 1345 (11th Cir. 1984), *abrogated on other grounds by* U.S. v. Lewis, 492 F.3d 1219 (11th Cir. 2007).   In a case alleging protracted criminal activity and seeking a wiretap, however, the standard for staleness is relaxed:

When criminal activity is protracted and continuous, it is more

---

[6]The Judge's October 16, 2006 order and the November 14, 2006 extension specifically named Royster, and are therefore not at issue.

likely that the passage of time will not dissipate probable cause. In such circumstances, it is reasonable to assume that the activity has continued beyond the last dates mentioned in the affidavit, and may still be continuing. Time becomes less significant in the wiretap context, because the evidence sought to be seized is not a tangible object easily destroyed or removed. Therefore, when police describe telephone activity occurring over an extended period of time, the stale information issue should be construed less rigorously.

Domme, 753 F.2d at 953.

Defendant's argument that the information used to support the wiretap application was stale is refuted by the record established by the investigating agents. The four informants, although interviewed separately and at different times during the investigation, gave the same description of Walker as a multi-kilogram distributor of cocaine. The informants gave detailed information about the amount and type of drugs being distributed, the locations where the drugs were being distributed, and the names of other participants. This information was "self corroborating" and suffices to establish the credibility and reliability of the information provided. United States v. Smith, 918 F.2d 1501, 1507 (11th Cir. 1990) (information supplied by the informant that is "complete, specific and detailed information" is referred to as "self-corroborating").

The informants' assessment of Walker's activities immediately prior to the September 21, 2006 interception order was bolstered by the May 4, 2006 incident where Walker, Jackson, and White arranged for the sale of cocaine to CI 80-672. This showed that Walker was engaged in the sale of cocaine and that the information from the informants was accurate, current, and reliable. The July 10, 2006 meeting between Jenkins, Walker, and Jackson,

wherein Walker agreed to sell Jenkins multi-kilogram quantities of cocaine for $19,000 per kilogram, showed that Walker had continued to sell cocaine before and up to the time the interception order was issued. Finally, Frederick Ferguson had provided information about Walker's involvement in the distribution of narcotics on September 14, 2006 after Ferguson's arrest. On September 18, 2007, Jenkins called Agent Cole to advise him that Walker was "laying low" due to the recent arrest of Frederick Ferguson, who was one of Walker's associates.

Further, the toll analysis that Agent Cole conducted on Walker's two phones showed a pattern of repeat calls to and from known drug dealers in the Tifton area. In light of the ongoing investigation and Walker's preexisting involvement with the activities being investigated, this additional evidence of repeat phone calls to known drug dealers provided an adequate basis for a probable cause determination that Walker "remained a part of the conspiracy and that his telephone was being used in connection with that conspiracy at the time the wiretap application was submitted." Bascaro, 742 F.2d at 1346.

G. *Misstatements Requiring Franks Hearing*

"Affidavits supporting warrants are presumed valid, and the party seeking suppression bears the burden of showing the omission was more than negligent." Van Horn, 789 F.2d at 1500 (citing Franks v. Delaware, 438 U.S. 154, 171 (1978)). Franks only applies, however, to intentional or reckless omissions from an affidavit. Id.

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of

deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

Franks v. Delaware, 438 U.S. at 171-72; see also United States v. Martin, 615 F.2d 318, 328 (5th Cir. 1980) (Fourth Amendment requires a hearing if defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause).

The alleged misstatement in this case is a comment in the affidavit where Agent Cole stated "it was determined that Leonard Royster was one of the major sources of cocaine for Anthony Walker." This comment is contained in paragraph three of the affidavit in support of the order to intercept calls on Royster's phone. Agent Cole specifically stated that this affidavit was based on court-ordered interception of two phones belonging to Walker. Agent Cole's statement was not falsely made with reckless disregard for the truth, nor was it

knowingly or intentionally false. Rather, it was simply his assessment of information he learned from the conversations on Walker's phone, which provided information indicating that Walker and Royster were working together in the distribution of cocaine. Royster has failed to overcome the presumption of validity that attaches to statements made in the affidavit, therefore a <u>Franks</u> hearing is not required.

### H. Timely Sealing

After surveillance has concluded, the agents must ensure that the records are sealed in a timely manner. The statute requires that the recording of wire, oral, or electronic communications be protected from editing or other alterations. "Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." <u>United States v. Matthews</u>, 431 F.3d 1296, 1307 (11th Cir. 2005) (citing 18 U.S.C. § 2518(8)(a)). If the Government fails to seal the recordings immediately, it must provided a "satisfactory explanation" for the delay. <u>Id.</u> In <u>Matthews</u>, the court found that sealing the recordings within two days of the conclusion of the surveillance was "immediate" under the statute. <u>Id.</u> A "satisfactory explanation" as contemplated by "§ 2518(8)(a) must be understood to require that the Government explain not only why a delay occurred but also why it is excusable." <u>United States v. Ojeda Rios</u>, 495 U.S. 257, 265 (1990).

The recordings for two of the phone numbers at issue in this case were sealed "immediately" as defined in <u>Matthews</u>: The Orders for interception of 229-407-7806 and 229-392-9234 expired on December 20, 2006 and the records were sealed on December 22,

2006. These recordings were therefore timely sealed.

The remaining two numbers were not sealed immediately, which was at least in part due to the logistics of getting the tapes from their original location to the judge for sealing. Although the listening post where the calls were monitored was located in the Macon DEA office, the calls themselves were recorded on the DEA's main server in Atlanta. The calls were therefore simultaneously recorded in Atlanta and monitored in Macon. At the conclusion of the interception for each number, Macon DEA Agent Buford Jordan coordinated with the DEA Special Operations Group in Atlanta in order to travel to their office at the federal building in downtown Atlanta to obtain the master recordings. Agent Jordan would then transport the master recordings back to Macon and meet with Agent Cole who would take possession of the master recordings. In turn, Agent Cole coordinated with Tift County District Attorney Paul Bowden who then coordinated with Tift County Superior Court Judge Gary McCorvey to arrange a meeting so that the application to seal the recordings for each intercept could be signed by Agent Cole, District Attorney Brown and Judge McCorvey.

Three days elapsed between the completion of interceptions and sealing the recordings for 229-347-1553. The government has, however, provided a satisfactory explanation for the delay. Agent Cole testified that he received the tapes from Agent Jordan on December 6th, the day after the interceptions terminated. On that day he began to try to coordinate a time to meet when he, the district attorney, and Judge McCorvey would all be available to seal the tapes. December 8th was the first day that the judge and the district attorney's schedules

permitted them to be present to seal the tapes, and that was the day on which the sealing occurred. Scheduling difficulties for a judge is a satisfactory explanation for a delay in sealing. See, e.g., United States v. Cline, 349 F.3d 1276, 1284 (10th Cir. 2003) (holding that judges' unavailability excused seven-day delay); United States v. Pedroni, 958 F.2d 262, 266 (9th Cir. 1992) (excusing fourteen-day delay due to judge's scheduling difficulties and other factors); United States v. Maxwell, 25 F.3d 1389, 1394 (8th Cir. 1994) ("intervening weekends, holidays and the unavailability of the issuing judge are satisfactory explanations"). Complying with the standard operating procedure regarding sealing recordings required coordination of five parties: the individuals with access to the Atlanta DEA main frame, Agent Jordan as the liaison between the GBI and Atlanta DEA, Agent Cole as the primary investigator in the case and the person responsible for delivering the tapes to the judge, the District Attorney, and Judge McCorvey. These parties were located in Atlanta, Macon, and Tift County. In addition, the delay in this case was relatively short. Considering all these factors collectively, the Court finds that the recordings for 229-347-1553 were timely sealed.

The longest delay in sealing was eight days for the recordings of interception for 229-392-6181. This interception extension order terminated on December 14, 2006 and was sealed on December 20th. Agent Jordan stated that the intercepts expired on the evening of December 14, 2006. He had no explanation, however, for why he or someone working at his direction did not obtain the tapes on Friday, December 15, 2006. December 16 and 17 fell on a weekend. Agent Jordan obtained the tapes on December 18th and delivered them to Agent Cole on December 20th. Agent Cole did not deliver them to the judge for sealing until

December 20th.

Agent Jordan testified that the Atlanta mainframe, where the recordings were located, was not staffed at all times. Presumably, it was not staffed after hours or on weekends. Even if the Court presumes that Agent Jordan could not obtain the tapes during evening hours or during the weekend due to the lack of staff in the main frame room,[7] Agent Buford nonetheless failed to account for December 15, 2006, and Agent Cole did not provide an explanation for failing to deliver the tapes on December 18-19, 2006. Under Ojeda Rios the Government must provide an explanation for not only why the delay occurred but why it is excusable. In the case of 229-392-6181, the Government failed to provide either explanation for the 15th, 18th, or 19th of December. The records of interception for 229-392-6181 are therefore suppressed.

## I. Effect of Suppression of Wiretap Evidence from Royster's Phone

Some of the evidence obtained from intercepting Royster's phone contributed to the finding of probable cause for intercepting Walkers' phones. Suppressing the evidence from Royster's phone does not, however, mean that the evidence from Walker's wiretaps must be suppressed under the "fruit of the poisonous tree" doctrine. Where there is no claim of a constitutional violation from a violation of the wiretapping statute, suppression is only an appropriate remedy if it is required under the statutory scheme. United States v. Chavez, 416

---

[7]This presumption is generous, because there was in fact no conclusive evidence presented regarding the hours during which the investigators could have obtained the tapes.

U.S. 562, 571 (1974).

The subsection that requires that records be sealed states that "[t]he presence of a seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom *under subsection (3) of section 2517*." 18 U.S.C.A. § 2518(8) (emphasis added). The statute therefore only prohibits the use of derivative evidence when it is the kind described in § 2517(3), i.e., testimony by a witness about the contents of conversations of the unsealed wiretap.

By its terms, this statute does not prohibit the use of evidence under § 2517(1) or (2). Subsection 2 of § 2517 allows a law enforcement officer to use the contents of a wiretap "to the extent such use is appropriate to the proper performance of his official duties." 18 U.S.C. § 2517(2). The legislative history of this subsection indicates that one of the uses that Congress intended was to establish probable cause for a search. United States v. Donlan, 825 F.2d 653, 655 (2nd Cir. 1987) (citing S. Rep. No. 1097, 90th Cong., 2d Sess. 99). The statute therefore does not prohibit the use of unsealed wiretaps to establish probable cause for another wiretap. See id. (allowing into evidence tangible evidence and statements made that were the fruit of untimely sealed wiretap); United States v. Fury, 554 F.2d 522 (2d Cir. 1977) (interpreting state wiretap statute that was modeled off the federal statute and holding that evidence from unsealed wiretap can be used to create probable cause for subsequent wiretap). The suppression of the evidence obtained from interception of Royster's phone thus has no effect on the admissibility of the remaining wiretaps.

**I. Search Warrant for Royster's Residence**

On December 12, 2006, Judge McCorvey issued a search warrant for Royster's residence, 3101 3rd Avenue, Tifton, Georgia. The objects of the search were specified as cocaine, U.S. currency, and all packaging, receipts, ledgers, documents, containers, and proceeds derived from and used in the distribution of cocaine. The warrant was executed on December 19, 2006. Defendant argues that the affidavit was not supported by probable cause, it contained stale information, and it was unconstitutionally over-broad and non-particularized.

1. Probable Cause

a. Standard

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." Betancourt, 734 F.2d at 754 (citation omitted). To establish probable cause for a search warrant, an affidavit must demonstrate: (1) a connection between the defendant and the location to be searched; (2) a link between the location and the alleged criminal activity; and (3) the informant's veracity and basis of knowledge. United States v. Davis, 313 F.3d 1300, 1303 (11th Cir. 2002). In the absence of independent police corroboration of information from a confidential source, an informant's reliability can be established by showing his veracity, basis of knowledge, or a combination of those things. United States v. Brundidge, 170 F.3d 1350, 1352-53 (11th Cir. 1999). Demonstrating that the confidential informant has provided some correct information makes

it more likely that his other claims will also be true. See Spinalli v. United States, 393 U.S. 410, 427 (1969). An informant's reliability can be established by providing accurate information regarding past crimes. See, e.g., United States v. Figueroa, 720 F.2d 1239, 1244 (11th Cir. 1983). Furthermore, there is no per se rule that requires police corroboration of facts that a confidential informant provides in every case. Brundidge, 170 F.3d at 1353.

The test for determining probable cause for the issuance of a search warrant is a totality of the circumstances. Illinois v. Gates, 462 U.S. 213 (1983). Based on this test, the issuing judge must make a "practical, common-sense decision" whether there is probable cause to issue the search warrant. Id. at 238. The "duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for concluding' that probable cause existed." Id. at 238-39. Great deference is accorded the magistrate's determination of probable cause for issuance of a search warrant. United States v. Gonzalez, 940 F.2d 1413 (11th Cir. 1991). "A magistrate's decision that probable cause exists is conclusive absent arbitrariness." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citation omitted).

b. Analysis

In the present case, Defendant was linked to the property to be searched because it was his primary residence. The residence was also linked to criminal activity in the affidavit, which stated: "Source 1 has revealed that Royster consistently receives and keeps most of the money generated from the sale of cocaine under his control and at the target residence." Aff. & Application Search Warrant at 1. Defendant contends that this "bald allegation" by Source

39

1 is insufficient to establish the connection between the residence and criminal activity. Instead, he insists that it was necessary to corroborate this information in some way.[8] However, because the affidavit established that the informant was reliable, police corroboration of every statement that the informant made was not necessary.

Source 1's veracity was confirmed by relating the detailed facts of two incidents on which he provided accurate information. The affidavit describes two different occasions on which surveillance corroborated the information that Source 1 provided. On the first occasion, Source 1 told law enforcement that Walker met with and delivered cocaine to Royster on a rural country road. According to the affidavit, "this" was verified through surveillance and a tracking device on Walker's vehicle. The passage in its entirety reads:

> On one occasion Source 1 revealed that Walker contacted Royster and ordered a large quantity of cocaine and Royster met with and delivered the cocaine to Walker on a rural country road. This was verified through surveillance and the use of a court ordered vehicle tracking device that had been placed on one of Walker's vehicles.

Aff. & Application Search Warrant at 1.

Defendant protests on the basis that the affidavit does not specifically spell out exactly what was verified. The Court finds, however, that the affidavit did provide sufficient evidence for the issuing judge to conclude that Source 1's information was corroborated. The

---

[8]Specifically, he suggests that the informant's claim that Royster kept drug money in his house should have been linked to an instance where the informant provided information that law enforcement later verified, i.e., Royster's meeting at the Pilot gas station or the meeting between Walker and Royster on a country road. Def.'s Amended Mot. Suppress at 8.

placement of the clause "[t]his was verified" indicates that everything in the first sentence was verified. In addition, the affidavit provides specific details of how the information was verified, i.e., by a tracking device and physical surveillance. It therefore allowed the judge to make an independent verification of the source's reliability and did not require him to rely on the bare conclusions of others.

Source 1's veracity was also corroborated on a separate incident. Source 1 told law enforcement that Roster was planning on meeting with a middle man for his source of cocaine and deliver a payment for cocaine. The affidavit stated that before the meeting Royster was observed backing his car into a garage with his trunk open. He then switched vehicles and used a semi truck to drive to the meeting. After the meeting, the driver was kept under constant surveillance until he was pulled over when the money was discovered. Defendant argues that this incident does not confirm the veracity of Source 1 because there was no allegation that the officers saw Royster with a package when he met with the middle man or that law enforcement saw Royster give him anything.

Royster's suspicious behavior is coupled with the fact that the individual with whom he met was soon after pulled over and discovered to have a large amount of cash, which was consistent with a payment to a large-scale drug supplier. These facts, viewed together, indicate that there was probable cause to believe that Royster did in fact give the money to this individual. "[P]robable cause does not demand the certainty we associate with formal trials. Gates, 462 U.S. at 246. The facts surrounding this incident provide sufficient evidence for the judge to determine that the informant was reliable.

There was also probable cause to believe that evidence of criminal activity would be discovered at Royster's house because Source 1, who was established as reliable, revealed that (1) the Defendant regularly kept money generated from the sale of large quantities of cocaine at the target residence, and (2) Defendant Royster had spoken to a source of supply regarding an upcoming shipment of cocaine provided Judge McCorvey more than adequate information to grant the application for a search warrant. Furthermore, Defendant has pointed to no evidence that would satisfy his burden to overcome the presumption of validity that attaches to the search warrant.

### 2. Particularity

"Search warrants must also satisfy the requirement of particularity to prevent 'general, exploratory rummaging in a person's belongings,' but elaborate specificity is unnecessary. The description is considered 'sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized.' " Betancourt, 734 F.2d at 755 (citations omitted). This particularity requirement is flexible depending on the type of property to be seized. United States v. Wuagneux, 683 F.2d 1343, 1349 (11th Cir. 1982). The description should be "as specific as the circumstances and nature of activity under investigation permit." Id. An extensive search may be reasonable when the nature of a crime is complex or is such that detection of the crime requires a broader search. Id. at 1352. The ultimate question is whether the search was reasonable under all the circumstances." Id.

The warrant in this case permitted the search and seizure of "cocaine, U.S. currency

and all packaging, receipts, ledgers, documents, containers and proceeds derived from and used in the distribution of cocaine." The items to be seized that were listed in the warrant were sufficiently detailed. Law enforcement would not be able to indiscriminately seize items or engage in "exploratory rummaging" because the warrant described in specific, concrete terms identifiable items to which the warrant applied. Considering that everyday items are commonly used in the distribution of drugs, the warrant described the items with as much particularity as possible.

### 3. Staleness

The affidavit stated that "Source 1 has revealed that in the past 48 hours Royster has spoken to the source of supply in which Royster inquired about another shipment of cocaine." This information, which was provided by a reliable informant, is clearly not stale.

### 4. Good Faith Exception

Finally, the good faith exception would apply in this case even if there was not sufficient probable cause for the warrants. Defendant argues that the good faith exception does not apply because "the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." See United States v. Leon, 468 U.S. 897, 923 (1984). Even assuming *arguendo* that probable cause was lacking, however, it was not unreasonable for the issuing judge to concluded that probable cause existed. Therefore even if this Court found there was no probable cause for the search warrant, suppression would be an improper remedy. Defendant's Motion to Suppress the evidence obtained pursuant to the execution of the search warrant is therefore denied.

Defendant also contests the introduction of evidence of items seized pursuant to his arrest because (1) the arrest was unlawful and therefore the products of the search are the fruit of the poisonous tree and (2) the search of his person was conducted without a warrant or any exception to the warrant requirement. The Government has conceded, however, that "no information relating to the search of the Defendant's person at the time of arrest was or will be used in the prosecution of the instant case." Resp. Def.'s Mot. Suppress at 3 n.1. This issue is therefore moot.

## III. CONCLUSION

Based on the foregoing, Defendant Royster's Motion to Suppress (Doc. 270) is granted in part and denied in part. As discussed above, Defendant's Motion for Disclosure (Doc. 271) is denied as moot.

**SO ORDERED this 7th day of December, 2007.**

_____/S_____
**HUGH LAWSON**
**UNITED STATES DISTRICT JUDGE**

cf, tch/HL